AMERICAN COMMUNICATIONS ASSOCIATION, LOCAL 10, I.B.T., and Morton Cohen, Gus Protentis, Gabriel Meltzer, Mary Pinotti, Val Comforto, Robert Cooney, Baird Jackson, Plaintiffs,

v.

RETIREMENT PLAN FOR EMPLOYEES OF RCA CORPORATION AND SUBSIDIARY COMPANIES, RCA Corporation, RCA Global Communications, Inc., RCA American Communications, Inc., Globcom Systems Inc. and Morgan Guaranty Trust Company of New York, The Chase Manhattan Bank, N. A., Manufacturers Hanover Trust Company and Harris Trust and Savings Bank, Individually and as Trustees of the Retirement Plan for Employees of RCA Corporation and Subsidiary Companies, Defendants.

No. 79 Civ. 4107.

United States District Court,
S. D. New York.

April 24, 1980.

Cohen, Weiss & Simon, New York City, for plaintiffs; Samuel J. Cohen, Jani K. Rachelson, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendants Retirement Plan for Emp. of RCA Corp. and Subsidiary Companies, RCA Corp., RCA Global Communications, Inc., RCA American Communications, Inc., Morgan Guaranty Trust Co. of New York, Manufacturers Hanover Trust Co. and Harris Trust and Sav. Bank; Joel C. Balsam, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for defendant The Chase Manhattan Bank, N.A.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiffs, in an amended complaint, challenge certain aspects of the administration of the Retirement Plan for Employees of RCA Corporation and Subsidiary Companies (the "Plan"), a "defined benefit" pension plan[1] governed by the Employee Retirement Income Security Act ("ERISA").[2] Plaintiffs are seven employees of three RCA subsidiaries who allege they are participants in the Plan within the meaning of ERISA.[3] Also named as a plaintiff is the American Communications Association, Local 10, I.B.T. ("ACA"), the certified bargaining representative of the employees of the subsidiaries. The defendants are the Plan itself,[4] RCA Corporation,[5] the RCA subsidiaries that are the employers of the individual plaintiffs (collectively the "RCA defendants" or "RCA") and four banks which are the trustees of the Plan. The defendants move to dismiss the amended complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted.

Under the Plan, participants receive retirement benefits, calculated pursuant to formulae, which are jointly funded by the employees' and RCA's contributions.[6] Those eligible to participate in the Plan, in addition to wage and salaried employees, include officers, executives and other highly-paid personnel of the RCA defendants. "Earnings" used in the calculation of a participant's contributions and retirement benefits include salary and wages, as well as RCA Incentive Plan payments and bonuses.[7]

Although five separate causes of action are alleged, essentially they focus on two distinct claims. The first is directed to bonus and Incentive Plan payments made, in the sole discretion of RCA, according to plaintiffs, exclusively and selectively to highly-compensated executives who constitute a small fraction of the participants in the Plan. The essence of the charge is that the inclusion of such payments in the earnings formulae translates into increased pension benefits to the recipient-executives disproportionate to the benefits of lower-paid participants which, plaintiffs contend, constitutes a "diversion" of the Plan's assets; that by reason thereof the defendants have breached their fiduciary duty, to "act solely in the interests of the participants and ben-

---

1. 29 U.S.C. § 1002(35). Treasury Regulation § 1.401 1(b)(1)(i) states that under a defined benefit pension plan "[r]etirement benefits generally are measured by, and based on, such factors as years of service and compensation received by the employees. The determination of the amount of retirement benefits and the contributions to provide such benefits are not dependent upon profits." *Compare* 29 U.S.C. § 1002(34) (defining "individual account" or "defined contribution" plan).

2. 29 U.S.C. §§ 1001 1381.

3. 29 U.S.C. § 1002(7).

4. An employee benefit plan may be sued under ERISA as an entity. 29 U.S.C. § 1132(d)(1).

5. RCA Corporation is the administrator and "named fiduciary" of the Plan. *See* 29 U.S.C. § 1102; Plan § 13(a).

6. Plan § 3(a).

7. Plan § 18(11).

eficiaries" as required by section 404 of ERISA[8] and, in the instance of the RCA defendants, in violation of the collective bargaining agreement.[9] The second basic claim is that the assets of the Plan have been invested imprudently in violation of the defendants' fiduciary obligation under ERISA and New York State Law.

We first consider the charge of "diversion" of the assets of the Plan based upon the granting of bonus and incentive payments to selected executives and not to others which, under the first cause of action, is the basis of the claim that the defendants have breached their statutory duties under section 404 and, under the second cause of action, charges a breach by the RCA defendants of the collective bargaining agreement.

■ The Court is of the view that the first and second causes of action fail to state cognizable claims. The "diversion" of assets of the Plan alleged by the plaintiffs based upon bonus and Incentive Plan payments to "a select minority of highly paid participants" suggests not only an impairment of the Plan's assets but a reduction in the amount of benefits the plaintiffs, as participants, are or may be entitled to receive but for the claimed disproportionate benefits to the minority of highly-paid participants. This contention fails when tested against the terms of the Plan and the requirements of ERISA.

8. 29 U.S.C. § 1104.

9. The second and third causes of action proceed upon the assumption that the Plan is covered by the collective bargaining agreement between ACA and the RCA defendants, an assumption the defendants challenge. While no references to the Plan are contained in the collective bargaining agreement, the parties have negotiated with regard to certain terms of the Plan and reflected their agreements as to such terms in letter agreements. None of these, however, pertain to the inclusion of bonuses and Incentive Plan payments in "earnings." Whether these letter agreements incorporate the Plan by reference into the collective bargaining agreement need not be decided in light of the Court's conclusion with respect to the "diversion" claim.

As already noted, the funds of the Plan used to finance benefits are derived from both the participants' contributions and those of the employers. Employee contributions to the contributory annuity (the basic benefit under the Plan) are generally a fixed percentage of "earnings" after approximately the first $6,500 annually.[10] The balance of the funds necessary to provide for the payment of contributory annuities are contributed by the RCA defendants.[11] The retirement benefits to which a participant is entitled are based upon that participant's earnings.[12] Other benefits are provided for under the Plan but these are financed solely by the RCA defendants.[13]

Under the Plan RCA's contributions are such amounts as it determines are appropriate to provide for the payment of contributory annuities and the other benefits provided for under the Plan. Thus by the terms of the Plan the contributions required of RCA are geared to meet the payment of contributory annuities and other benefits of the Plan. While an employee-participant's contributions are precisely determinable under the Plan, RCA's contributions may vary from year to year based upon changes in personnel, increased periods of service of employees, increases in compensation, payments of benefits, gains and losses from investment of the trust fund, to mention but a few factors. The amounts so contributed annually by RCA are determined on an actuarial basis. The participants in the Plan are not, however, relegated to reliance upon the RCA defendants' commitment to

10. "Earnings" for the purpose of calculating employee *contributions* also include bonuses and thus a highly-paid employee who receives a bonus and increased pension rights is also required to make a correspondingly larger contribution to the Plan.

11. Plan § 3(a). "The employer contributes such amounts as it determines to be appropriate to provide for the payment of contributory annuities. These joint contributions of employees and employer provide for the payment of contributory annuities that are accrued under this plan."

12. Plan § 4.

13. Plan § 3(c).

fund the Plan currently or to their determination as to what is appropriate funding to provide for the payment of benefits (although the plaintiffs do not allege that this commitment has been breached). The employers' contributions must also meet the minimum funding standards of ERISA.

Section 302 of the Act [14] requires, in essence, that an employer's annual contributions to a defined benefit plan meet the current annual cost (determined under an approved actuarial method) [15] of future pension benefits and administrative expenses ("normal cost"). [16] Failure to satisfy the minimum funding standards (which again the plaintiffs have not alleged), subjects an employer both to civil liability under ERISA and to the imposition of a special non-deductible excise tax under the federal tax law. [17]

Under both the Plan and the requirements of ERISA, it is thus apparent that when the Plan incurs increased liabilities for pension benefits by reason of the award of bonuses and incentive payments to a participant, these liabilities are required to be currently funded by corresponding increases in RCA contributions. The label of "diversion" plaintiffs place on the effect of awarding bonuses because they increase Plan liabilities due the recipients is, accordingly, a misnomer, for the assets of the Plan are not a fixed resource but are augmented by RCA as future obligations of the Plan increase. Moreover, it is significant that the participant-plaintiffs do not allege that the benefits to which they are or may be entitled under the Plan have been impaired in any respect by reason of the participation in the Plan by executives based upon the inclusion of bonus and incentive payments in calculating the benefits to which the latter are entitled as participants in the Plan.

The fallacy in plaintiffs' "diversion" theory is further underscored by their position—acknowledged in response to the Court's questioning—with respect to salary increases in contrast to bonuses. Plaintiffs do not dispute the right of the employers to award bonuses or to fix compensation. So, too, they admit that increases in pension rights created by increased salary payments are not diversions of Plan assets. However, both salary and bonus payments are included in "earnings" to determine pension benefits without distinction between them. Thus their effect on the Plan's assets and liabilities are identical. Logic compels the conclusion that if an increase in one form of compensation works no "diversion" of assets, neither does an increase in the other. Accordingly, as the matters alleged in plaintiffs' first and second causes of action do not constitute any "diversion" of Plan assets, there is no basis to sustain a claim of breach of fiduciary duty or a corresponding breach of the collective bargaining agreement. These causes of action are dismissed. [18]

 The second prong of plaintiffs' attack charges imprudent investment by the trustees of the Plan's assets. The complaint alleges that these assets have been "imprudently invested so as to provide a lower return or yield than could have been obtained by the exercise of prudence" and that the defendants continue to act without the prudence imposed upon a fiduciary. The fourth cause of action charges that by such conduct the fiduciaries violated the

14. 29 U.S.C. § 1082.

15. The Plan employs the "unit credit method," an actuarial method expressly approved under ERISA. 29 U.S.C. § 1002(31).

16. See 29 U.S.C. § 1002(28). The employer's contribution is also adjusted to reflect the actual experience of the Plan and changes in actuarial assumptions used under the Plan.

17. See 29 U.S.C. § 1132(a)(3) (civil liability); 26 U.S.C. § 4971 (excise tax). See also H. Conf. Rep. No. 93 1280, 93d Cong., 2d Sess., reprint-ed in [1974] U.S.Code Cong. & Admin.News, pp. 4639, 5038, 5065.

18. Plaintiffs' "Third Cause of Action" merely alleges that ACA by virtue of its duty to its members of fair representation has a duty to enforce the fiduciary obligations alleged by plaintiffs to have been breached. These allegations do not even purport to state a separate claim against any of the defendants.

standards of prudent care specified in section 404 of ERISA.[19] The fifth cause of action alleges that the same conduct violated New York law governing fiduciaries. Plaintiffs seek an injunction against a continuance of the alleged conduct and to hold defendants liable for damages allegedly sustained by the Plan.

The defendants initially contend that even if the assets had been invested imprudently, as plaintiffs charge, they have suffered no injury. This contention essentially is based upon the same argument advanced in support of their motion to dismiss the "diversion" claims—that since the Plan is a "defined benefit" plan with the participants entitled to receive precise and determined benefits and with RCA obligated under the Plan and the minimum funding and other requirements of ERISA to make a contribution to the Plan to fund the aggregate pension liability as actuarially determined periodically, plaintiffs have sustained no damage as a result of any investments of the retirement plan's assets.

We do not consider the merits of this contention, since the fourth and fifth causes of action are deficient in that they are utterly without factual content to support the conclusory allegation of lack of prudent management. A claim of a lower return "than could have been obtained by the exercise of prudence" does not set forth in what respect the fiduciaries failed in their duty. The mere fact that there may have been a decline in the value of the Plan's portfolio or a diminution of income in a given year does not by itself establish imprudent management. Indeed, market fluctuations have expressly been rejected as untrustworthy indicia of value—especially in times of economic decline.[20] The standard to be applied is that of conduct, tested at the time of the investment decision, rather than performance, judged from the vantage point of hindsight.[21] The complaint contains no factual specification of any act the trustees took or failed to take that resulted in the lower rate of return alleged by plaintiffs. Plaintiffs have not alleged a single act of commission or omission to indicate that the trustees were derelict in the discharge of their fiduciary duties or in what respect it is charged that the trustees failed to discharge those duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[22]

This is no matter of technical pleading. Defendants should not be put to the heavy burden and expense of litigation unless a properly pleaded complaint requires them to defend. This is not a case where plaintiffs cannot ascertain whether there is a factual basis to support a proper claim. RCA, by statute, is required to file annual reports which contain adequate information upon which to ground a claim of imprudent conduct if one is warranted.[23] Each annual report filed must include a financial statement containing, inter alia, a schedule of the Plan's assets and liabilities, a statement of receipts and disbursements, and a schedule of all assets held by the Plan for investment purposes (identifying material matters as to each asset such as rate of interest, cost, and current value).[24] Copies of the annual report (with financial statement) are

**19.** 29 U.S.C. § 1104 provides in pertinent part:

 (a)(1) . . . a fiduciary shall discharge his duties with respect to a plan . . .

 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

**20.** See Matter of Clark, 257 N.Y. 132, 139, 177 N.E. 397 (1931). See also Stark v. United States Trust Co. of New York, 445 F.Supp. 670, 678 79 (S.D.N.Y.1978) (citing cases).

**21.** See Matter of Clark, 257 N.Y. 132, 177 N.E. 397 (1931); In re Morgan Guaranty Trust Co. of New York, 89 Misc.2d 1088, 396 N.Y.S.2d 781, 784 (Sur.1977).

**22.** See note 19, supra.

**23.** 29 U.S.C. § 1023.

**24.** Id. § 1023(b)(3).

required to be filed by a plan's administrator with the Secretary of Labor (who shall make it available for public inspection)[25] and to be made available for examination by any participant at the administrator's offices. The administrator is also required to furnish a copy of the report to any participant upon written request.[26]

■ It is not sufficient to say that appropriate allegations to plead a sufficient cause of action will be made after pre-trial discovery. *Conley v. Gibson*,[27] pressed by plaintiffs, does not authorize parties to use an insufficient complaint with a conclusory allegation as a hunting license to discover whether in fact a viable claim may be alleged. The discovery rules are designed to support a properly pleaded cause of action and to prepare defenses to charges made—not to discover whether a claim exists.[28]

It must be recognized that in this instance discovery with respect to millions upon millions of dollars of investments (the net assets of the Plan at the end of 1978 were in excess of one billion dollars) and a multitude of individual transactions would involve not only defendants but plaintiffs in burdensome and time-consuming activities and heavy expenses.[29] Neither plaintiffs nor defendants should be subjected thereto particularly where it is a simple matter to obtain, if the facts so warrant, sufficient information to plead a cause of action speci-

fying in what respect the trustees are alleged to have violated their duties of prudent management. Accordingly, the fourth and fifth causes of action are dismissed for failure to state a claim with leave to plaintiffs, if so advised, to file an amended complaint within thirty (30) days of the date hereof.

So ordered.

---

25. *Id.* § 1024(a).

26. *Id.* § 1024(b).

27. 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

28. *See Cohen v. Illinois Inst. of Tech.*, 524 F.2d 818, 827 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *Kadar Corp. v. Milbury*, 549 F.2d 230, 233 & n.2 (1st Cir. 1977); *McLaughlin v. Copeland*, 455 F.Supp. 749, 753 (D.Del.1978), *aff'd*, 595 F.2d 1213 (3d Cir. 1979); *EEOC v. Carter Carburetor*, 76 F.R.D. 143 (E.D.Mo.1977), *vacated on other grounds*, 577 F.2d 43 (8th Cir. 1978), *cert. denied*, 439 U.S. 1081, 99 S.Ct. 865, 59 L.Ed.2d 52 (1979). *Cf. Segal v. Gordon*, 467 F.2d 602, 606 07 (2d Cir. 1972); *Ross v. A. H. Robbins Co.*, 607 F.2d 545, 557 (2d Cir. 1979) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975)); *Denny v. Barber*, 73 F.R.D. 6, 10

(S.D.N.Y.1977), *aff'd*, 576 F.2d 465 (2d Cir. 1978).

There has been much criticism by bench, bar and legal commentators that the discovery process has been abused and used contrary to its original intended purposes—that is to obtain evidence in support of a claim or defense and to confine the issues in a given case resulting in an expeditious trial. *See, e. g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975); Renfrew, Discovery Sanctions: A Judicial Perspective, 67 Calif.L.Rev. 264, 266–67 (1979); Pollack, Discovery—Its Abuse and Correction, 80 F.R.D. 219 (1978); Kirkham, Complex Civil Litigation—Have Good Intentions Gone Awry?, 70 F.R.D. 199, 204 (1976).

29. *Cf. duPont Glore Forgan Inc. v. American Telephone & T. Co.*, 69 F.R.D. 481, 487 (S.D.N.Y.1975).