Glenn **KUPER, et al., Plaintiffs,**

v.

**QUANTUM CHEMICALS CORPORATION, et al., Defendants.**

No. C–1–91–0918.

United States District Court, S.D. Ohio.

May 24, 1994.

Robert Blair Matusoff, Dayton, OH, Russell Allen Kelm, Schwartz Kelm Warren & Ramirez, Columbus, OH, for plaintiffs.

James Kaufman Lawrence, James Ralph Adams, Frost & Jacobs, Cincinnati, OH, for defendants.

## ORDER

CARL B. RUBIN, District Judge.

This matter is before the Court for resolution of all remaining issues, based upon the trial briefs (Docs. 78, 81), the reply briefs (Docs. 85, 86), the proposed findings of fact and conclusions of law (Docs. 80, 83) and the stipulated record (*see* Docs. 74, 82) submitted by the parties.

### Procedural History

Plaintiffs are former employees of the Emery Division ["Emery"] of Quantum Chemical Corporation ["Quantum"], who participated in employer-sponsored stock ownership plans before Quantum sold Emery to Henkel Corporation. On December 27, 1991, Plaintiffs filed a purported class action complaint asserting various federal and state law claims against Defendants. (Doc. 1). On May 7, 1992, Plaintiffs moved for certification of a class. (Doc. 9).

On August 27, 1992, the Court issued an order granting judgment against Plaintiffs and in favor of Defendants, on statute of limitations and other grounds, as to all claims set forth in Plaintiffs' complaint *except* those brought pursuant to the Employee Retirement Income Security Act [ERISA], 29 U.S.C. § 1132(a)(1)(B). (Doc. 30). Plaintiffs' ERISA claims are based upon the uncontested and significant "diminution in value" of Plaintiffs' Quantum stock over an 18–month period when such stock was held in employer-sponsored plans.

On November 3, 1992, the Court denied Plaintiffs' motion for class certification, based in part upon a potential conflict of interest of designated class counsel. 145 F.R.D. 80. (Doc. 35). On February 17, 1993, Plaintiffs filed a notice substituting new trial counsel on their behalf. (Doc. 44). Plaintiffs thereafter filed a renewed motion for class certification. (Doc. 45). Following a hearing on April 2, 1993, and finding that the substitution of counsel had removed the former impediment, the Court certified the matter as a class action, defining the relevant class as follows:

All persons who are former salaried employees of Quantum Chemical Corpora-

tion's ("Quantum") Emery Division between the dates of December 28, 1988 and November 1, 1990, inclusive ("the Class Period"), and who participated in Quantum's Savings and Stock Ownership Plan and/or Quantum's Employee Stock Ownership Plan ("ESOP").

(Doc. 49, p. 4).

On February 17, 1993, Defendants filed a motion for summary judgment as to Plaintiffs' remaining ERISA claims. (Doc. 43). On July 21, 1993, the Court held that Plaintiffs possessed standing to pursue the ERISA claims. (Doc. 52). On October 27, 1993, however, after permitting Plaintiffs additional time to respond to Defendants' motion, the Court determined that Plaintiffs had failed to come forward with sufficient evidence to suggest that Quantum and its Board of Directors had acted in a fiduciary capacity with respect to the ESOP funds. 838 F.Supp. 342. Accordingly, the Court granted summary judgment in favor of those Defendants. (Doc. 67).

The Court nonetheless found that a genuine issue of material fact existed as to whether the individual trustees and/or benefits committee members responsible for administering the relevant plan had breached their fiduciary duties. Two of the committee members (Defendants Howard Burkhardt and F. Donald Brigham) were among five defendants dismissed by the Court on October 8, 1993, based upon Plaintiffs' failure to show cause why they had not received service of process in a timely manner. (*See* Doc. 61). As to the remaining plan fiduciaries who had been properly served—individual Defendants H. Weston Clarke, Jr. and Michael Iovenko—the Court denied summary judgment. (Doc. 67). The sole remaining issues before the Court thus involve Plaintiffs' ERISA claims against those Defendants.

### The Parties' Claims

Plaintiffs argue that Defendants Clarke and Iovenko [hereinafter, "Defendants"] breached their fiduciary duties under ERISA when they failed, during the 18 months following Quantum's sale of Emery to Henkel, either to distribute the class members' ESOP interests or transfer them immediately into an appropriate Henkel Corporation trust fund, or to liquidate or diversify those ESOP interests to include investments other than Quantum stock. They further claim that Defendants breached their fiduciary duties by also failing to permit class members to exercise their annual diversification options pending transfer of the ESOP assets. In support of those arguments, Plaintiffs offer evidence of the uncontested and significant decline in the value of Quantum stock during the relevant time period, as well as deposition testimony and documents which purport to show that Defendants knew or should have discovered that Quantum stock values were likely to continue to drop, and thereby impair the class members' ESOP interests.

In response, Defendants first argue that they lacked authority to transfer, liquidate or diversify the class members' ESOP interests in Quantum stock, as the ESOP plan provisions specified that all ESOP funds were to be invested in Quantum stock. In addition, Defendants argue that even if they possessed discretion to otherwise invest the ESOP funds, their failure to so act did not constitute breach of fiduciary duty.

### Findings of Fact

1. Plaintiffs Glenn Kuper and Cliff Jones and all plaintiff class members were salaried employees of Quantum Chemical Corporation's Emery Division between December 28, 1988 and November 1, 1990. During that time, they participated in Quantum's Savings and Stock Ownership Plan ["the Plan"], including Quantum's Employee Stock Ownership Plan ["ESOP"].

2. Defendant H. Weston Clarke, Jr. was at all relevant times Quantum's vice president of human resources. He also chaired the benefits committee that administered Quantum employee benefit plans, including the above-referenced Plan and ESOP. (Doc. 74, p. 7, ¶ 5).

3. Defendant Michael Iovenko served as one of three trustees of the Quantum ESOP from January 1988 to February 1990. (Doc. 74, p. 7. ¶ 6).

4. On January 28, 1988, Quantum's Board of Directors amended the company's existing Savings and Stock Ownership Plan to add an ESOP feature. The Plan thereafter consisted of two components. The first of those—known as the "Savings Plan"—was a self-directed 401–K plan, in which employees could contribute a portion of their income, up to 6 percent pretax, into any combination of three funds.[1] Participants in the Savings Plan were permitted to designate the percentage of their contribution to go to each fund, and to change their investment designation, including reassigning past benefits to a different fund. (Doc. 74, p. 7, ¶¶ 8–10).

The second component—the ESOP—consisted of (a) Quantum's matching contributions of Quantum stock, based upon each employee's 401–K contribution level, and (b) occasional ESOP bonuses contributed by Quantum's Board of Directors. Employees could not and did not contribute their own funds to the ESOP. (Doc. 74, p. 8, ¶ 11).

5. Section 5.01(a) of the Plan provides that the ESOP feature was "designed to be invested primarily in qualified" Quantum securities. (Joint Exhibit I, § 5.01(a)).

6. Eligible Quantum employees were offered an opportunity to participate in the ESOP pursuant to a prospectus dated February 8, 1988. Employees hired before April 1, 1988 were to be 100% vested in their ESOP funds. Employees hired on or after that date were to become 100% vested after completing two years of service. The Plan provided that vested plan participants would not forfeit their ESOP benefits upon leaving Quantum's employ. (Doc. 74, p. 8, ¶¶ 12–14).

7. Plaintiffs Kuper and Jones received the original Quantum ESOP prospectus in or about February 1988. (Doc. 74, p. 8, ¶ 8). Both participated in both the ESOP and 401–K components of the Plan.

8. Beginning in 1988 and throughout their participation in the 401–K Savings Plan, Plaintiffs Kuper and Jones elected to be and remained 100% vested in the Quantum stock fund portion of that Plan. (Doc. 74, p. 12, ¶ 38).

9. In accordance with the Plan documents, Quantum's Board of Directors appointed a benefits committee of not less than three members to administer the Plan. The Board of Directors also appointed separate trustees for the ESOP component of the Plan. (Doc. 74, p. 9, ¶¶ 16, 20–21).

10. Defendants Clarke and Iovenko acted in those respective capacities during the times at issue herein. (Doc. 74, pp. 7, 9, ¶¶ 5–6, 21).

11. The benefits committee prepared minutes of its periodic meetings from April 1989 to November 1990. The ESOP trustees prepared minutes of their periodic meetings from April 1989 to February 1990.

12. On December 27, 1988, Quantum's Board of Directors approved and announced a $50.00 per share special cash dividend that would be paid to each record shareholder as of January 7, 1989, as part of a recapitalization plan. (Doc. 74, p. 10, ¶ 28).

13. On or about March 11, 1989, Quantum entered into an "Asset Sale Agreement" to sell its Emery Division to Henkel Corporation, effective April 17, 1989. In connection with that agreement, Henkel also executed an "Employment Agreement" in which it agreed to continue the employment of existing Emery employees under comparable terms and conditions. As part of the Employment Agreement, Henkel also agreed to accept from Quantum a trust-to-trust transfer of the employee benefit plan assets, including Savings Plan and ESOP funds, of those Quantum salaried employees who continued employment with Henkel after the sale. (Doc. 74, pp. 11–12, ¶¶ 30–31, 33).

14. The trust-to-trust transfer agreement was a nonfiduciary business decision.

15. In accordance with the Employment Agreement, Plaintiffs Kuper and Jones continued their employment with Henkel following the sale, in the same jobs, at the same salaries, and with the same benefits. (Doc. 74, p. 11, ¶ 32).

16. Although the sale of Emery to Henkel was effective on April 17, 1989, the trust-

---

**1.** The three funds available for this purpose were as follows: (a) a guaranteed interest fund, (b) a Standard & Poor's fund, and (c) a Quantum stock fund.

to-trust transfer of Quantum employee benefit plan assets was not completed until some eighteen months later. On September 12, 1990, Quantum authorized transfer to the Henkel Investment Plan of all Quantum stock held in the Quantum ESOP. The transfer was completed on September 20, 1990, and Henkel credited the Quantum ESOP assets to individual Emery employee accounts on November 1, 1990. (Doc. 82, p. 2. ¶¶ 3–5).

17. From April 1989 through October 1990, the value of Quantum stock declined from a trading value of more than $50.00 per share to slightly more than $10.00 per share.

18. At no time from date of sale of the Emery division until the trust-to-trust transfer was completed did the Quantum ESOP trustees or the Quantum benefits committee consider diversifying or liquidating the ESOP. (Doc. 84, p. 1, ¶ 1).

19. During the time immediately preceding and in the 18 months following sale of the Emery division, Defendants either were aware of or became aware of, or had access to information about, a continuing series of circumstances likely to impact upon Quantum's future financial prospects, including the following: that Quantum's recapitalization had adversely affected the company's financial condition, increasing its debt burden well as its interest expense and principal repayment obligations; that Quantum had decreased the diversity of its operations; that the market price of Quantum's primary product had declined; that a major fire at one of Quantum's plants had hindered the company's production capacity; and that Quantum's net sales and income were declining.

20. Plaintiff Kuper's ESOP shares of Quantum stock were transferred to the Henkel Investment Plan pursuant to the Employment Agreement. Plaintiff did not sell his shares of Quantum stock after the transfer, but continued to hold them through at least November 9, 1993 [the date on which the parties' Final Pretrial Order with included stipulated facts was filed]. (Doc. 74, pp. 12, 13, ¶¶ 34, 41).

21. Plaintiff Jones retired on July 1, 1989, prior to the trust-to-trust transfer of benefit plan assets. He therefore elected on May 25, 1989 to withdraw his ESOP account balance as shares of Quantum stock. His ESOP and 401–K shares of Quantum stock thereafter were distributed to him in full. Jones continued to hold such Quantum stock through 1990. (Doc. 74, p. 12, ¶¶ 35, 39).

22. The plan contained provisions permitted Quantum employees who met certain conditions to make an annual election to diversify their ESOP account.

23. Neither Plaintiff Jones nor Plaintiff Kuper was eligible to exercise the ESOP diversification option.

24. There is no evidence to indicate that any eligible class member either attempted to or was denied an opportunity to exercise the ESOP diversification option during the 18 month period at issue herein.

25. On January 12, 1989, Defendant Clarke personally purchased 1,500 shares of Quantum stock for himself. He continued to hold those and any other personal shares of Quantum stock throughout the time period that is the subject of this action. (Clarke Deposition, pp. 120–21).

26. During the 18 months following the sale of the Emery division, various independent investment advisors and brokers advised investors either to purchase or to refrain from selling Quantum stock. There is no evidence that Defendants received or were otherwise aware of such independent investment advice.

27. Plaintiffs have not alleged, nor does the evidence indicate, that Defendants' failure to liquidate or diversify the Quantum stock in the Quantum ESOP accounts was motivated by self-dealing or other malfeasance on the part of Defendants.

## OPINION

The sole issue remaining for the Court to resolve in this action is whether Defendants violated their fiduciary duty of due diligence with respect to the subject employee benefit accounts. Examining the scope of a fiduciary's duties under ERISA thus seems to be an

appropriate introduction to the Court's analysis.

### Standard of Care Required of ERISA Fiduciaries

#### A. Generally

On the subject of fiduciary duties, ERISA provides as follows, in pertinent part:

**(a) Prudent man standard of care**

(1) Subject to [other sections] of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

\*　　\*　　\*　　\*　　\*　　\*

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [these and other] provisions of ... this chapter.

29 U.S.C. § 1104(a)(1).

The Sixth Circuit Court of Appeals has identified three components within those fiduciary requirements. The first, termed the "duty of loyalty," requires "an eye single to the interests of the participants and beneficiaries." *Berlin v. Michigan Bell Tel. Co.,* 858 F.2d 1154, 1162 (6th Cir.1988) (citing *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982)). The second, the "prudent man" obligation, imposes "an unwavering duty" to act both "as a prudent person would act in a similar situation" and "with single-minded devotion" to those same plan participants and beneficiaries. *Id.* (citing *Morse v. Stanley,* 732 F.2d 1139, 1145 (2d Cir.1984)). Finally, the "exclusive purpose" obligation focuses on the duty to provide benefits to plan beneficiaries. *Id. See also Varhola v. Cyclops Corp.,* 657 F.Supp. 595, 597 (S.D.Ohio 1985) (Weber, J.), *aff'd in part and remanded on other grounds,* 820 F.2d 809 (6th Cir.1987). The apparent overlap among the three components irrefutably implies that the interests of plan participants and beneficiaries are at the core of any ERISA fiduciary's responsibilities.

#### B. Employee Stock Ownership Plans

Despite the general constraints governing the conduct of ERISA fiduciaries, however, ERISA has carved out specific exceptions to certain of § 1104's provisions. "Congress has repeatedly expressed its intent to encourage the formation of ESOPs by passing legislation granting such plans favorable treatment, and has warned against judicial and administrative action that would thwart that goal." *Donovan v. Cunningham,* 716 F.2d 1455, 1466 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984) (footnotes omitted). ERISA explicitly recognizes that an "employee stock ownership plan ... is designed to invest primarily in qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A).[2] Accordingly, "qualifying employer securities" have been exempted not only from ERISA's diversification requirement, but also from the prudence requirement, "to the extent that [such requirement could be construed to] require \* diversification." 29 U.S.C. § 1104(a)(2). The definition of a "qualifying employer security" for ERISA purposes includes employer stock. 29 U.S.C. § 1107(d)(5)(A).

### Defendants' Ability to Liquidate or Diversify ESOP

■ In their respective trial briefs, both Plaintiffs and Defendants devote considerable space to their opposing contentions regarding Defendants' power or discretion to invest the Quantum ESOP funds in securities other than Quantum stock. Defendants

---

**2.** Plaintiffs also concede that ESOPs are, "by definition," designed with the intent of investing primarily in employer stock or similar securities. (*See* Doc. 78, p. 6).

point with conviction to specific language of the Quantum plan which designates Quantum stock as the intended vehicle for Quantum ESOP investment. (*See, e.g.,* Joint Exhibit I, p. 40, §§ 4.01(b), 4.02(b)). Given that ERISA directs fiduciaries to act in accordance with the provisions of their particular employee benefits plan, *see* 29 U.S.C. § 1104(a)(1)(D), Defendants argue that such plan language constrained them from liquidating or diversifying the Quantum ESOPs. Defendants further urge that ERISA implicitly has approved such plan restrictions on investment of ESOP funds, by acknowledging that investment in employer securities is the primary aim of ESOPs, and by exempting ESOP investments from ERISA's diversification requirements. *See* 29 U.S.C. §§ 1107(d)(6)(A), 1104(a)(2).

Conversely, Plaintiffs contend that Quantum's employee benefits plan provisions do not mandate that ESOP funds be invested exclusively in Quantum stock, but rather can be construed to permit investment in other funds. (*See* Joint Ex. I, p. 44, § 5.01(a); Joint Ex. II, pp. 5–7). Moreover, they argue that a plan provision mandating exclusive investment in Quantum stock would contravene ERISA by effectively excusing fiduciaries from any duty of diligence with respect to investment of the ESOP funds. *See, e.g., Fink v. National Sav. & Trust Co.,* 772 F.2d 951, 955 (D.C.Cir.1985). Plaintiffs urge the Court to find that such strict adherence to a plan's purported limitation on investment options would be neither consistent with nor intended by ERISA.

Both viewpoints have merit, and both also have serious implications regarding the powers and duties of fiduciaries who are expected to administer ESOP investments consistent with the provisions of both a specific employee benefits plan and ERISA. For example, defendants who attempted to diversify ESOP assets conceivably could confront potential liability for failure to comply with plan documents. *See, e.g., Schoenholtz v. Doniger,* 657 F.Supp. 899, 909 (S.D.N.Y.1987) (ERISA fiduciaries found liable for failure to invest 100% of plan funds in employer securities, in accordance with provisions of plan).

In reviewing ERISA's provisions regarding fiduciary duties, however, the Court is reminded that the prevailing concern consistently expressed therein is for "the interest of the [plan] participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A). *See also Berlin,* 858 F.2d at 1162. Indeed, the fiduciary's duty to act "in accordance with the documents and instruments governing the plan" is expressly stated to extend only "insofar as such documents and instruments are consistent with [other ERISA] provisions." 29 U.S.C. § 1104(a)(1)(D). *See also Pratt v. Petroleum Production Management Employee Sav. Plan & Trust,* 920 F.2d 651, 657 (10th Cir.1990). Surely the duty to conform to plan provisions cannot have been intended to override the fiduciary's foremost duty to serve the interests of plan participants and beneficiaries.

Accordingly, this Court concludes that the Quantum plan provisions at issue herein must be interpreted, consistent with ERISA, to provide that the Quantum ESOP fiduciaries did possess discretion to place ESOP funds into investments other than Quantum stock, in the event that the interests of the plan participants and beneficiaries so required. The Court's inquiry now must turn to the question of whether Defendants breached their duty by failing to exercise that discretion to liquidate or diversify the Quantum ESOP accounts following the sale of the Emery division.

### Conduct of Defendants Under "Prudent Fiduciary" Standard

On its face, ERISA appears to have intended to provide that fiduciaries of ESOPs containing qualified employer securities will *not* be found to have violated their fiduciary duties to diversify and of prudence simply by investing the plan assets solely in employer stock. 29 U.S.C. § 1104(a)(2). Plaintiffs, however, argue that Defendants nonetheless breached their fiduciary duties by failing even to *consider* liquidating, diversifying or transferring the Quantum stock in the ESOP accounts of its former Emery division employees, after a prudent fiduciary allegedly would have recognized that failure to take action would jeopardize the plan assets.

Although the Sixth Circuit does not appear to have addressed the issue, considerable case law does support the general proposition that administrators of ESOPs are not wholly excused from exercising due diligence simply by reason of investing in employer stock. For example, the District of Columbia Circuit Court of Appeals has recognized that "the requirement of prudence in investment decisions and the requirement that all acquisitions be solely in the interest of plan participants continue to apply," despite the diversification exemptions for qualifying employer securities. *Fink*, 772 F.2d at 955.

Similarly, the Fifth Circuit has observed that ERISA's competing objectives—safeguarding employee benefits by enforcing fiduciary responsibility, versus encouraging the formation of ESOPs—are expressed in "equally forceful terms." *Donovan*, 716 F.2d at 1466. Accordingly, "an ESOP fiduciary, just as fiduciaries of other plans, *is* governed by the 'solely in the interest' and 'prudence' tests of [ERISA]." *Eaves v. Penn*, 587 F.2d 453, 459 (10th Cir.1983) (emphasis added). Permitting ESOP fiduciaries to engage in certain conduct that would constitute *per se* violations of ERISA in the context of other types of employee benefit plans does not likewise excuse ESOP fiduciaries from the other duties imposed on ERISA fiduciaries. *Id.*

Still, "the special statutory rules applicable to ESOPs inevitably affect the fiduciary's duties under [29 U.S.C.] § 1104." *Martin v. Feilen*, 965 F.2d 660, 665 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993). Defendants' conduct as fiduciaries therefore must be examined in light of the varied obligations applicable to fiduciaries of ESOPs. Plaintiffs claim that those obligations include a duty to continually reevaluate an investment and to consider alternatives thereto.

A. *Failure to Investigate as Basis for Liability*

Plaintiffs urge the Court to find that Defendants' admitted failure even to consider liquidation or diversification is alone sufficient grounds for holding Defendants accountable for breaching the standard of care required of ERISA fiduciaries. This Court cannot accept Plaintiffs' premise in that regard.

■ Significant authority does support the proposition that ERISA fiduciaries have a duty to investigate the investments they administer. *See Fink*, 772 F.2d at 955; *Whitfield v. Cohen*, 682 F.Supp. 188, 194–95 (S.D.N.Y.1988). The following "prudent man" test articulates the standard typically applied to evaluate how fiduciaries have discharged that duty to investigate:

> whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.

*Fink*, 772 F.2d at 955, and *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984) (both quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984)).

Nevertheless, that duty is not absolute. "[P]roof of a causal connection ... is required between a breach of fiduciary duty and the loss alleged." *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 279 (2d Cir.1992) (citing *Whitfield v. Lindemann*, 853 F.2d 1298, 1304 (5th Cir.1988), *cert. denied*, 490 U.S. 1089, 109 S.Ct. 2428, 104 L.Ed.2d 986 (1989), and *Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir.1982)). Accordingly, in each case recognizing a duty to investigate, the court also appears to have recognized that liability should be imposed for failure to investigate only if an adequate investigation would have revealed to a prudent fiduciary that the investment at issue was improvident. *See, e.g., Fink*, 772 F.2d at 962 (Scalia, J., concurring in part and dissenting in part) (noting that a fiduciary's breach of the duty to investigate and evaluate investments does not necessarily constitute breach of the duty to invest prudently); *Whitfield*, 682 F.Supp. at 195 (commenting on the necessity of examining "whether, considering the facts that an adequate and thorough investigation would have revealed, the investment was objectively imprudent"); *Katsaros*, 744 F.2d at 279 (affirming liability

where "[a] reasonable investigation would have revealed evidence that the [investment] was totally unsound."). To hold otherwise would be to hold ERISA fiduciaries who exercise less than absolute vigilance automatically accountable for every market decline, even if the decline could not have been anticipated through the most exacting scrutiny.

Assuming *arguendo*, then, that these Defendants failed to discharge their fiduciary duty by failing to examine other investment options, circumstances also must demonstrate that Plaintiffs' damages in fact were attributable to that omission. As another court recently observed:

> Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.

*Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir.1994). The Court therefore must determine how a "hypothetical prudent fiduciary" would have reacted if faced with the circumstances presented herein. As "the prudent person standard is not concerned with results," *id.* at 918, the Court must evaluate the fiduciaries' actions "from the perspective of the 'time of the investment decision' rather than from 'the vantage point of hindsight'." *Katsaros*, 744 F.2d at 279 (quoting *American Communications Ass'n v. Retirement Plan*, 488 F.Supp. 479, 483 (S.D.N.Y.), *aff'd*, 646 F.2d 559 (2d Cir.1980)). Such judicial review of fiduciary actions has been termed "highly deferential." *Ershick v. United Missouri Bank*, 948 F.2d 660, 666 (10th Cir.1991) (citing *Anderson v. Ciba–Geigy Corp.*, 759 F.2d 1518, 1522 (11th Cir. 1985)).

### B. *Failure to Liquidate or Diversify as Basis for Liability*

■ Various authorities have conflicted in the manner in which they have allocated the burden of proof on the issue of causal connection. *See Whitfield v. Lindemann*, 853 F.2d at 1304–05. Even assuming that the burden falls upon the defendant, however, the evidence presented in this matter has convinced the Court that a "hypothetical prudent fiduciary" acting with the benefit of an adequate investigation would likely not have performed differently than did these Defendants.

Initially, the fact that financial problems presumably were at least part of the impetus for Quantum's sale of the Emery division is not a sufficient basis for concluding that a reasonable fiduciary would have recognized that investments in Quantum stock thereafter would be imprudent. While Defendants could reasonably have anticipated that the special dividend payment made in January 1988 would cause the value of Quantum stock to dip temporarily, nothing at the time of the Emery sale would have alerted a reasonable fiduciary that a significant downward trend was likely to continue. The Tenth Circuit Court of Appeals has found that ESOP fiduciaries who purchased additional employer stock despite allegations that they "should have known" that the employer's "financial condition was deteriorating" did not violate their fiduciary duties. *Ershick*, 948 F.2d at 667. This Court concurs in that conclusion.

In addition, although the evidence concededly shows an overall downward pattern in the market value of Quantum stock during the 18 months following the Emery sale, that decline was neither sudden and dramatic nor consistent enough to alert an objective observer at any discrete point in time that the stock's likely performance in the foreseeable future warranted immediate sale. The parties' exhibits indicate that the price of Quantum stock either increased or remained steady on numerous occasions after the Emery sale. (*See* Joint Ex. VII). Such peaks and plateaus, while both small and temporary, gave Defendants some objective indication that the Quantum stock price might rebound sufficiently to recover at least some portion of the ESOP losses. (*See* Doc. 80, Appendix, Ex. I). The Court concludes that careful monitoring of the market performance of Quantum common stock during the subject 18 month period would *not* have compelled a prudent investor to sell the stock at any particular point in time, so as to absorb the short-term losses rather than await a possible recovery.

Moreover, evidence submitted by Defendants confirms that numerous established

and presumably impartial investment advisors[3] issued reports during the relevant time periods that encouraged investors either to buy or to continue to hold Quantum stock. (*See* Defendants' Trial Exhibits, Volume I, Exs. 107–139; Volume II, Exs. 139–168).[4] Indeed, evidence that independent, professional observers of market trends differed in their projections of future Quantum stock performance merely underscores the fact that circumstances then existing would not have compelled reasonable persons to a singular conclusion about the stock's future prospects. As such outside entities had access to much the same information made available to Defendants about internal Quantum problems and external market factors likely to influence Quantum's future stock performance (*see, e.g.,* Plaintiffs' Ex. 12; Doc. 78, pp. 9–13), Defendants cannot be said to have been objectively imprudent for having acted in the same manner as impartial observers had recommended.

Coupled with additional proof that *both Plaintiffs* held Quantum stock in their Quantum 401–K plans throughout the relevant time period, without ever attempting to liquidate or otherwise diversify the Quantum holdings over which they had some measure of control, such evidence convinces the Court that an adequate investigation conducted at that time would *not* have compelled a hypothetical prudent fiduciary to liquidate or diversify the Quantum stock held in Plaintiffs' Quantum ESOP accounts.

**C.** *Liability Based upon Role in Trust-to-Trust Transfer*

■ Irrespective of Defendants' failure to liquidate or diversify the Quantum stock in Plaintiffs' ESOP accounts during the relevant 18 months, Plaintiffs additionally maintain that Defendants breached their fiduciary duty by maintaining the ESOP accounts in a trust fund awaiting transfer to a Henkel trust fund, rather than distributing the ESOP proceeds upon sale of the Emery division. This theory of liability presumes that the trust-to-trust transfer was a fiduciary decision over which Defendants exercised some control. The record does not support that assumption.

■ Case law in this Circuit and elsewhere confirms that fiduciaries are not responsible for the consequences of all corporate business decisions that may affect employee benefits. *See, e.g., Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990); *Bryant v. International Fruit Product Co.,* 886 F.2d 132, 134 (6th Cir.1989); *Rinard v. Eastern Co.,* 769 F.Supp. 1416, 1427 (S.D.Ohio 1991) (Graham, J.), *rev'd on other grounds,* 978 F.2d 265 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1843, 123 L.Ed.2d 468 (1993). Plaintiffs have not refuted the overwhelming evidence that the trust-to-trust transfer was a business decision arranged by Quantum's board of directors in connection with the sale of the Emery division, and over which Defendants exercised no control in their capacity as ERISA fiduciaries. As such, Defendants have no liability thereon.

**D.** *Liability Based upon Foreclosure of Diversification Option*

■ Finally, Plaintiffs argue that Defendants are liable for preventing Plaintiff class

---

**3.** Such advice was offered by brokerage firms that included Dean Witter, Salomon Brothers, Paine Webber, Merrill Lynch, Bear Stearns, Drexel Burnham, Shearson Lehman and Goldman Sachs, among others. Although Plaintiffs have objected to the introduction of such exhibits because Defendants have not shown that they relied upon or even reviewed those reports, the Court finds that such reports *are* relevant for the limited purpose of providing insight as to how a "hypothetical prudent fiduciary" might have reacted to these circumstances—the very standard at issue herein.

**4.** Although Plaintiffs have objected to these reports as hearsay, that objection is not well taken. Even assuming that the reports constitute hear-

say, they appear to fall within at least one exception to the hearsay exclusion. *See, e.g.,* Fed. R.Evid. 803(17) (hearsay exception for market reports and commercial publications). Moreover, the Court believes that the offered reports are *not* hearsay in the context in which the Court has considered them, as they have been offered *not* to prove the truth of the matter asserted (*i.e.,* that Quantum stock continued to be a good investment, which, in retrospect, it clearly was not), *see* Fed.R.Evid. 801(c), but rather to establish that reasonable persons with full knowledge of the then-existing facts could have concluded, rightly or wrongly, that buying or holding Quantum stock was a prudent investment decision.

members from exercising their right to diversify their ESOP funds during the 18 months following the Emery sale. Defendants concede that Quantum's ERISA plan does provide for employees who meet certain, specified qualifications to elect to diversify their ESOP holdings. Nevertheless, they argue that the election does not come into play in this matter for two reasons—first, that class representatives Kuper and Jones lack standing to assert such a claim because they personally were not eligible to exercise such an election under the plan, and second, that as no eligible class member attempted to employ the diversification option, Defendants prevented no one from exercising that right.

While Plaintiffs respond to the standing argument by arguing that the Court already has addressed that issue, they offer nothing to counter Defendants' assertion that no class member invoked the provision to elect to diversify. Having failed to offer any evidence that Defendants denied any class member the right to exercise such election, Plaintiffs cannot pursue a claim on that basis.

### Conclusion

As a result of the provision exempting ESOPs from the diversification ordinarily required of ERISA investments, an ESOP account unquestionably "places employee retirement assets at much greater risk than does the typical diversified ERISA plan." *Martin v. Feilen,* 965 F.2d at 664. But, as the Court in *Martin* aptly noted, "that is a question for Congress." *Id.* The Court recognizes and regrets that the risk inherent in investing exclusively in employer securities resulted here in a significant loss to Plaintiffs' retirement savings. However, "ERISA guarantees only the right to receive vested benefits, not a particular amount." *Ershick,* 948 F.2d at 668 (citing *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 512, 101 S.Ct. 1895, 1900–01, 68 L.Ed.2d 402 (1981)).

By enacting ERISA with specific exemptions for ESOPs, Congress signalled its conviction that ESOP investment in employer stock is a desirable practice that should be encouraged. This Court will not assume that Congress thereby intended to foist upon ESOP fiduciaries the additional duty of clairvoyance. While these Defendants may have acted without the benefit of an investigation, they also acted without the benefit of the 20/20 hindsight that now bolsters Plaintiffs' allegations. Defendants were in the untenable position of facing possible liability if they retained the ESOP shares of Quantum stock and their value continued to decline—this case—or if they transferred ESOP assets out of Quantum stock and the stock's value thereafter rose. *See, e.g., Schoenholtz,* 657 F.Supp. at 909 (suit based upon plan fiduciary's failure to invest 100% of plan assets in employer stock); *Central Trust Co., N.A. v. American Avents Corp.,* 771 F.Supp. 871 (S.D.Ohio 1989) (Sherman, M.J.) (suit to determine a plan fiduciary's right to sell rather than retain stock in an ESOP). Despite what we all now know about the fate of Quantum common stock from April 1989 to October 1990, nothing in the record before this Court establishes that a "hypothetical prudent fiduciary," evaluating Plaintiffs' ESOP holdings in Quantum stock during that time period, would necessarily have concluded that the interests of the plan participants and beneficiaries required liquidating or diversifying the Quantum stock.

### Conclusions of Law

1. The Quantum Savings and Stock Ownership Plan is subject to the provisions of ERISA. 29 U.S.C. § 1132(a)(1)(B).

2. The Quantum stock held in the Quantum ESOP accounts constituted "qualifying employer securities" as defined by ERISA. 29 U.S.C. § 1107(d)(5)(A).

3. Defendants possessed discretion to liquidate the Quantum ESOP funds or to place them in investments other than employer securities, if the interests of plan participants and beneficiaries so required. 29 U.S.C. §§ 1104(a)(1)(A) & (D); *Fink v. National Sav. & Trust Co.,* 772 F.2d 951, 955–56 (D.C.Cir.1985).

4. Defendants' failure to consider liquidating or diversifying the Quantum ESOP accounts did not constitute a breach of their fiduciary duty, as the circumstances then existing would not have compelled a hypotheti-

**1400**

cal prudent fiduciary, acting at that time and with the benefit of an adequate investigation, to conclude that continued investment in Quantum stock would be imprudent. *Fink,* 772 F.2d at 955; *Roth v. Sawyer–Cleator Lumber Co.,* 16 F.3d 915, 919 (8th Cir.1994); *Katsaros v. Cody,* 744 F.2d 270, 279 (2d Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Ershick v. United Missouri Bank,* 948 F.2d 660, 666 (10th Cir. 1991).

5. The agreement to transfer the subject Quantum ESOP assets into a Henkel trust account was a corporate business decision for which Defendants had no responsibility in their capacity as fiduciaries, and for which they therefore are not subject to liability. *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990).

6. Plaintiffs have failed to establish that any eligible class member was denied an opportunity to exercise his or her diversification rights, and they therefore cannot proceed on that theory.

IT THEREFORE IS ORDERED that judgment hereby is entered in FAVOR of Defendants CLARKE and IOVENKO and AGAINST Plaintiffs on Plaintiffs' remaining ERISA claims.

IT IS SO ORDERED.