David W. SILVERMAN, Plaintiff,

v.

**MUTUAL BENEFIT LIFE INSURANCE CO. et al., Defendants.**

No. 95–CV–0500 (ARR).

United States District Court,
E.D. New York.

Aug. 13, 1996.

David W. Silverman, New City, NY, pro se.

George Berger, Phillips, Nizer, Benjamin, Krim and Ballon, New York City, for Mutual Benefit Life Ins. Co.

Howard F. Wolfson, Patricia Anne Kuhn, Whitman, Breed, Abbot & Morgan, New York City, for Principal Mutual Life Ins. Co.

## OPINION AND ORDER

ROSS, District Judge:

In this action, a court-appointed fiduciary of an employee benefit plan seeks to hold an insurance company that acted as the plan's investment manager liable for the theft of assets by the plan's trustees. Plaintiff, David Silverman, argues that the insurance company, defendant Principal Mutual Life Insurance Co. ("Principal"), is liable as a co-fiduciary for the actions of the trustees under § 405(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1105(a). Principal and plaintiff have cross-moved for summary judgment. For the reasons stated herein, Principal's motion is granted, and plaintiff's motion is denied.

## FACTUAL BACKGROUND

Many of the facts relating to this action were outlined in the court's opinion and order of April 19, 1996, granting summary judgment for defendants Mutual Benefit Life Insurance Co. ("Mutual Benefit") and Helene Gorny, and dismissing plaintiff's claims against them. On July 15, 1988, Unitron Graphics, Inc. ("Unitron Graphics") established two profit-sharing plans (collectively, the "Plan") for the benefit of its employees.[1]

---

1. The two plans were identical, except that one was established for the benefit of union employees and one for the benefit of non-union employees. Plaintiff has sued as a fiduciary of the "Unitron Graphics, Inc., Profit Sharing Trust—Union and Non–Union Divisions," essentially

Zucker and Fertig, both officers of Unitron Graphics, were the trustees of the Plan and the named fiduciaries pursuant to § 402 of ERISA, 29 U.S.C. § 1102.

The Plan was what is known under ERISA as an "individual account plan" or a "defined contribution plan." *See* 29 U.S.C. § 1002(34). Each participating employee could elect to have Unitron set aside part of his salary and contribute it to the Plan. In addition, the company could make matching contributions and discretionary contributions. Prior to July 1, 1991, the Plan's assets were invested in a group annuity contract with Mutual Benefit. That contract provided that Mutual Benefit would maintain a separate account for each participant in the plan, and allowed each participant to allocate the money in his account among several different investment accounts that Mutual Benefit offered.

On July 1, 1991, Zucker wrote to Mutual Benefit and discontinued the Plan's group annuity contract. On that same day, he and Fertig entered into two new group annuity contracts with defendant Principal. Like the contract with Mutual Benefit, the contracts with Principal offered participants a choice of several investment options, and provided for individual recordkeeping for each participant's account. They also explicitly provided that:

> Application for and issuance of this contract constitutes appointment of and acceptance and affirmation by us [Principal] that (i) we are an Investment Manager as described under [ERISA] with respect to Plan assets held under this contract ... and (ii) we are qualified to accept such appointment and acknowledge that by virtue of such appointment we are a fiduciary of the Plan, within the meaning of

[ERISA] with respect to our responsibilities as Investment Manager.

Saunders Aff., Ex. A, at 241; Saunders Aff. Ex. B, at 298. The contracts did not specify that Principal was to be the sole investment manager of the Plan's assets. They did, however, set forth explicit procedures that the trustees were to follow in the event they decided to transfer any of the Plan's assets to an "alternate funding agent." Saunders Aff., Ex. A, at 235; Saunders Aff. Ex. B, at 292.

For reasons that are not entirely clear, Mutual Benefit did not release the Plan's funds immediately after Zucker's letter of July 1, 1991. On August 15, 1991, Zucker again wrote to Mutual Benefit, requesting release of certain of the funds held in certain of Mutual Benefit's investment accounts.[2] On August 30, 1991, Mutual Benefit issued a check made payable to the order of the Unitron Graphics, Inc. Profit Sharing Trust in the amount of $239,811.28. That check was deposited in the Plan's bank account at Citibank, N.A., on September 6, 1991.

Between September 20 and October 8, 1991, Zucker and Fertig embezzled $130,000 from the Plan by drawing three checks on the Citibank account. Two of the three checks were made payable to Zucker, and the third was made payable to his son. All three checks were signed by Zucker. *See* Wolfson Aff.Ex. D. The balance of the payment from Mutual Benefit, $109,811.28, was forwarded to Principal by wire transfer on October 8, 1991.

Prior to receipt of this money, Principal had received a letter from Howard Lowett, vice president for administration at Unitron Graphics, enclosing a breakdown by participant of the money that the Plan had received from Mutual Benefit. That letter, dated September 17, 1991, clearly indicated that

---

treating both trusts as a single entity. Since the distinction between the two plans is not material for the purposes of the issues presented here, the court will also treat the two plans as a single entity.

Plaintiff has also sued as a fiduciary of another entity designated simply the "Unitron Graphics, Inc. Profit Sharing Trust," from which Zucker and Fertig also embezzled money. It does not appear that this trust is relevant to this action.

**2.** As discussed in the court's opinion and order of April 19, 1996, Mutual Benefit was under a rehabilitation order from the New Jersey Superior court at the time of Zucker's request, and all funds in fixed-income accounts had been frozen. Zucker's letter requested the release of the remaining funds.

the total sum Mutual Benefit had sent the trustees was $239,811.28. Consequently, Principal knew by October 8, 1991, the date on which it received the wire transfer, that it did not have all of the Plan's assets. Furthermore, Principal was unable to allocate the $109,811.28 that it did have among the plan participants, because it had no way of knowing how to account for the missing $130,000 reflected on the statement from Mutual Benefit. Accordingly, Principal placed the entire sum in a money market account, where it would earn interest.

On November 5, 1991, Principal wrote to Zucker and Fertig. That letter raised two concerns that Principal had about the Plan. First, it noted that, with the exception of one payment, Principal had not received any of salary deferral contributions that Unitron was required to make to the Plan. Pursuant to a Department of Labor ("DOL") regulation, such salary deferrals become part of a plan's assets no later than 90 days after they are withheld from an employee's paycheck. *See* 29 C.F.R. § 2510.3–102 (1989). Second, it inquired about the missing $130,000. The letter stated, in relevant part:

> [W]e have learned that Mutual Benefit ... has liquidated and transferred to the Plans' Trustees all separate account assets that had been held by them. In turn, we have received, from what limited record-keeping data we have, only a portion of those separate account assets. The balance of these assets must be accounted for. It is our understanding that we are to be the only investment manager for your profit sharing plans. Given this, please forward the balance of these funds.
>
> If you have no intention of forwarding these funds in their entirety to us, contact us immediately in writing via the FAX number indicated below. On that basis, we will need to make an internal decision on whether we can continue to be associated with the Unitron Graphics, Inc. Profit Sharing Plans.

Saunders Aff.Ex. G; Pl.Ex. 6. Zucker and Fertig did not reply to this letter.

Principal did not take any further immediate action. Several internal memoranda submitted by plaintiff, however, disclose that Principal was aware of a potential legal problem with respect to the Plan. For example, one such memorandum, written by Marla Gowdey, an assistant analyst with Principal, and dated November 13, 1991, reads:

> Spoke to John Lee on 11/13/91. He told me that there may be a legal issue/problem on this case. We discussed that I probably should not call the client about anything until I hear from him.
>
> The client has received $130,000 transfer money from Mutual Benefit and is holding on to it instead of submitting it to us. They also have not been submitting regular contributions to us. The group rep and legal department are involved and a letter has been sent to the client requesting immediate deposit of funds.

Pl.Ex. 9. Two memoranda also indicate that, on January 14, 1992, a participant in the Plan named Lance Burt called Gowdey to request information about his account.

On January 28, 1992, Principal, through its assistant counsel, Randy Bolin, wrote again to Zucker and Fertig. The second letter reiterated the points made in the first letter in somewhat stronger language:

> To date we have received no response to [the November 5] letter. Your failure either to forward the requested funds to us or to notify us in writing of your intention not to forward these funds has forced us once again to address these issues with you.
>
> . . . .
>
> ... We have learned that Mutual Benefit recently transferred these separate account assets to you in your capacity as the plan trustees. Our records indicate, however, that we have only received a portion of these separate account assets from you since their release by Mutual Benefit. The balance of these assets must be accounted for. Within five business days after receipt of this letter, we request that you forward to us the balance of the separate account assets that were released to you by Mutual Benefit.
>
> It continues to be our understanding that we are to be the only investment manager for your profit sharing plans. If

this understanding is incorrect, we request that you notify us of this fact in writing within five business days after receipt of this letter. In addition we request that you notify us of the name or names of the outside investment managers that you intend to utilize in connection with your profit sharing plans and the amount of assets that have been transferred by you to these investment managers.

. . . .

If you have no intention of forwarding the requested funds in their entirety to us within five business days, please contact me immediately in writing via the FAX number indicated below. If we do not receive the requested funds from you, or a written response indicating your intended actions with respect to these funds within five business days after your receipt of this letter, we will be forced to provide you with the required written notice pursuant to our contracts that we will refuse any further contributions from you under the contracts.

Bolin Aff.Ex. A; Pl.Ex. 12.

Bolin's letter also addressed the delinquent contributions that Unitron was required to make to the Plan. With respect to that issue, he wrote:

[I]t is our opinion that Section 502($l$) of [ERISA] will require us to notify the Secretary of Labor of the fact that, according to our records, you do not appear to be currently complying with the requirements of DOL regulation 2510.3–102 in connection with the operation of your 401(k) plans. Under § 502($l$) of ERISA, the Secretary of Labor has the authority to assess a 20% penalty against any fiduciary who breaches his or her fiduciary duty or against any other person who knowingly participates in such a breach. . . .

Knowledge of your apparent failure to comply with Regulation 2510.3–102 subjects Principal Mutual Life Insurance Company to potential penalties under Section 502($l$) of ERISA if we do not act reasonably and in good faith. It is our opinion that to allow the current situation with respect to the employee deferrals to your 401(k) plans to exist any longer would

not be held by the Secretary of Labor to be an action taken by us that was reasonable and in good faith.

Bolin Aff., Ex. A; Pl.Ex. 12.

In spite of these stern warnings, Zucker and Fertig again failed to respond. Shortly after the second letter was written, however, an individual named "Mr. Freilich" contacted Bolin. He informed Bolin that Unitron Graphics had filed for bankruptcy, and asked if Principal would be willing to delay any notification to the Department of Labor for twelve months, until a buyer could be found for the company. Bolin stated in a memorandum, and reaffirmed in an affidavit to the court, that he told Freilich that Principal could not agree to such a request under any circumstances. Pl.Ex. 14; Bolin Aff. ¶ 5.

Nonetheless, Principal did not notify the Department of Labor or take any other formal action. Internal memoranda written in the wake of Bolin's letter again indicate Principal's awareness of a significant problem. One memorandum, written by Gowdey and dated February 13, 1992, reads:

This company [Unitron Graphics] has filed Chapter 11. Also, the trustees have been withholding payments to the retirement plans. Mike Saunders is the group rep and became aware that the trustees were not living up to their fiduciary responsibilities. Randy Bolin from Legal has been involved.

John Lee, Randy Bolin, and Scott Einck have been working very closely on the situation. Letters have been sent to the client. The last letter threatened that we were going to contact the DOL. It sounds as if some of the employees (a union is involved) have already contacted the DOL, so we may not need to contact them in our name.

Pl.Ex. 13.

In fact, Principal did not take any further action until March 30, 1992. On that date, the Department of Labor wrote to Principal, requesting information relating to the delinquent contributions and the funds from Mutual Benefit. Principal promptly complied with the DOL's request by letter dated April

2, 1992, and included copies of the November 5 and January 28 letters.

Zucker and Fertig were subsequently indicted on charges of embezzlement, conspiracy to embezzle, bank fraud, and filing false documents with the Internal Revenue Service. The allegations in the indictment reached well beyond the specific transactions that are at issue in this action; it charged that Zucker and Fertig had embezzled hundreds of thousands of dollars from the 401(k) plans and a third trust fund. Zucker and Fertig pled guilty to conspiracy to embezzle funds, in violation of 18 U.S.C. § 371. Judge Glasser of this court ordered the two men to make restitution, and appointed plaintiff as an independent fiduciary to collect all funds owed to the plans.

Plaintiff subsequently commenced this action against Principal, Mutual Benefit, Zucker and Fertig, seeking to recover the $130,000 embezzled by Zucker and Fertig. He subsequently amended the complaint to add a Mutual Benefit employee, Helene Gorny, as a defendant. In an opinion and order dated April 19, 1996, this court dismissed plaintiff's claims against Mutual Benefit and Gorny. Since plaintiff does not seek any relief against Zucker and Fertig beyond that already granted in the criminal proceeding, the only substantive claims that remain are those against Principal.

## DISCUSSION

Summary judgment is appropriate when no genuine issue of material fact exists in an action, and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In this case, the parties do not dispute most of the basic facts underlying this action. Rather, their dispute primarily involves questions of law, including the nature and scope of Principal's responsibilities as a fiduciary under ERISA. Summary judgment is therefore appropriate.

## I. Jurisdiction

The court begins its analysis by addressing an issue not raised by either party in its papers: subject-matter jurisdiction. Federal courts are all courts of limited jurisdiction, and the existence of a valid basis of jurisdiction is a threshold question in every federal case. In this case, plaintiff has identified § 502 of ERISA, 29 U.S.C. § 1132, and the general federal question jurisdiction statute, 28 U.S.C. § 1331, as authorizing jurisdiction in this action. The court agrees that it has jurisdiction over this matter. Some discussion of the reasoning behind that conclusion, however, is appropriate, because it helps to clarify an important legal issue in this case: whether plaintiff must prove that Principal's conduct actually caused the loss to Plan.

Section 502(a) of ERISA, as amended, lists nine different types of civil actions that may be brought under ERISA, three of which may be brought by fiduciaries of a plan. The relevant provisions of § 502(a) read as follows:

### (a) Persons empowered to bring a civil action

A civil action may be brought—

. . . .

(2) by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [or]

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan. . . .

29 U.S.C. § 1132(a). Section 502(e)(1) provides for exclusive jurisdiction in the federal district courts over both these types of action. In this case, plaintiff does not explicitly claim that he is seeking relief against Principal under § 409 of ERISA, 29 U.S.C. § 1109, which provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach. . . ." 29

U.S.C. § 1109(a). Rather, he hinges his claims against Principal solely on § 405(a) of ERISA, 29 U.S.C. § 1105(a), which describes the circumstances under which a fiduciary may be held liable for his co-fiduciary's breach of duty.

On its face, § 405 appears to provide a basis for imposing liability on a co-fiduciary that is independent from § 409. The caption of § 405 reads, "Liability for breach of co-fiduciary"—language that appears to parallel the caption of § 409, "Liability for breach of fiduciary duty." Furthermore, the first sentence of § 405(a) provides that a fiduciary's liability for a co-fiduciary's breach in the enumerated circumstances will be "[i]n addition to any liability which he may have under any other provision of this part...." These factors tend to suggest that Congress intended § 405 and § 409 to provide alternative, independent bases for imposing liability on fiduciaries.

That impression is belied, however, by an examination of ERISA's jurisdictional provisions in § 502. Although Congress authorized several types of plaintiffs to sue for violations of § 409, it did not create a parallel provision directly authorizing suits under § 405. As a fiduciary, plaintiff's options are limited to the types of suits described in § 502(a)(2) and (3). Furthermore, it is clear that § 502(a)(3) cannot authorize this action with respect to Principal. Plaintiff is not seeking to enjoin any act or practice or to enforce a provision of ERISA or the Plan. Nor is he seeking "other appropriate equitable relief" within the meaning of the statute. Plaintiff is seeking money damages from Principal as a result of Zucker and Fertig's

breach. Although money damages were available from courts of equity at common law, the Supreme Court has made it clear that such damages are not "equitable relief" authorized by § 502(a)(3).[3] *See Mertens v. Hewitt Associates,* 508 U.S. 248, 256–58, 113 S.Ct. 2063, 2069, 124 L.Ed.2d 161 (1993).

For this action to be cognizable under ERISA, it must be an action under § 502(a)(2) for appropriate relief under § 409, since § 405 does not provide an independent basis of liability. It simply imposes special duties that govern a fiduciary's relationship to its co-fiduciaries.[4] Consequently, plaintiff must meet the requirements of § 409 as well as the requirements of § 405 to prevail in this action. In order to prevail, then, plaintiff must prove (1) that Principal is a fiduciary, (2) that Principal breached a fiduciary duty imposed by § 405, and (3) losses to the Plan resulting from such breach. Each of these elements is discussed below.

## II. Principal's fiduciary status

█ To be liable under either § 409 or § 405, a defendant must be a "fiduciary" of an ERISA plan. Principal acknowledges that it was a fiduciary under ERISA for certain purposes, but contends that its duties were limited to the prudent management of the funds that it actually received from Zucker and Fertig. Since plaintiff does not argue that Principal engaged in any misconduct with respect to those funds, Principal contends that it is immune from liability for breach of fiduciary duty.

**3.** As an alternative to money damages, plaintiff seeks restitution, which is a form of "equitable relief" authorized by § 502(a)(3). *See Mertens,* 508 U.S. at 255–56, 256–58, 113 S.Ct. at 2068, 2069. Since there is no allegation here that Principal itself took any money from the Plan or otherwise profited from the trustees' misconduct, the remedy of restitution is unavailable.

**4.** In rare circumstances, courts have also recognized federal common-law rights of action under ERISA that do not fall into any of the categories enumerated in § 502(a). For example, the Second Circuit has recognized a common-law right of action by participants against non-fiduciaries for knowing participation in a breach of fiducia-

ry duty. *Diduck v. Kaszycki & Sons Contractors,* 974 F.2d 270, 280–81 (2d Cir.1992). Courts must undertake such projects with care, since ERISA's "carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Mertens,* 508 U.S. at 248, 113 S.Ct. at 2063 (quoting *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 146–47, 105 S.Ct. 3085, 3092–93, 87 L.Ed.2d 96 (1985)). Since § 502(a)(2) provides a vehicle for enforcing § 405, the court is unwilling to infer the existence of a direct federal common law action under § 405 and 28 U.S.C. § 1331.

The court rejects this contention. Under § 3(21)(A) of ERISA:

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Here, the group annuity contracts between the trustees and Principal specifically appointed Principal as an investment manager and acknowledged that it was a fiduciary. Moreover, Principal's November 5 and January 28 letters to the trustees indicate that Principal understood that it was to be the Plan's sole investment manager. If Principal was appointed as the sole investment manager of the Plan, with authority and control over the management of its assets, then it had a fiduciary responsibility with respect to all of those assets, whether or not it actually received them.

The cases Principal cites to the contrary are easily distinguishable. In *Brandt v. Grounds*, 502 F.Supp. 598 (N.D.Ill.1980), *aff'd*, 687 F.2d 895 (7th Cir.1982), a trustee of an ERISA plan embezzled $175,000 from two bank accounts. The other trustees sued the bank, alleging a breach of fiduciary duty. They argued that the bank was a fiduciary under ERISA because it had provided investment advice for a fee. The district court held, and the Seventh Circuit affirmed, that the bank's fiduciary status was limited to its function as an investment advisor, and that there was no causal connection between the advice that the bank rendered and the trustee's theft. Here, by contrast, Principal's fiduciary status does not depend simply on the fact that it offered investment advice. Rather, it stems from the fact that Principal agreed to be an investment manager with broad responsibility over the management and control of the Plan's assets. If Principal had undertaken to manage only a portion of the Plan's assets, then it might be immune from liability with respect to the assets that it did not manage. Here, however, Principal's own correspondence indicates that it understood that it was to be the sole manager of the Plan's assets.

*Pension Fund—Mid Jersey Trucking Industry—Local 701 v. Omni Funding Group*, 731 F.Supp. 161 (D.N.J.1990) involved a plan whose trustees set up an acquisition fund at a bank for the purpose of investing in mortgage loans. Although the bank had no discretion or control over these investments, it had authority to invest any excess monies from the fund in short-term securities. The court held that the bank was a fiduciary only with respect to the short-term security fund over which it exercised discretionary control. The alleged breach related solely to the mortgage loans. Relying on the district court decision in *Brandt*, the court concluded that the bank could not be liable because there was no causal link between its fiduciary role and the breach of its co-fiduciaries' duties. Again, however, the factual record in this case contains evidence indicating that Principal expressly assumed responsibility for all of the Plan's assets.

Care must be taken at this point to distinguish between two different issues that are somewhat conflated in the *Brandt* and *Omni Funding Group* opinions. The mere fact that Principal had a fiduciary duty with respect to the funds Zucker and Fertig embezzled from the Plan does not mean that the loss to the Plan resulted from a breach of that duty. That issue, also addressed in *Brandt* and *Omni Funding Group* is dealt with below. Based on Principal's own correspondence, however, the court concludes that, at the least, a genuine issue of material fact remains in this action as to whether Principal was a fiduciary with respect to the funds embezzled by Zucker and Fertig.

### III. Principal's liability under § 405(a)

Plaintiff alleges in this action that, as a fiduciary of the Plan, Principal is liable for Zucker and Fertig's breach of their fiduciary duty under § 405(a) of ERISA. That section provides that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission was a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a). Although the complaint alleges only that Principal is liable under § 405(a)(2) and (3), plaintiff argues in his moving papers that Principal is also liable under § 405(a)(1). The court addresses each of these contentions in turn.

## A. Liability under § 405(a)(1)

■ To hold a fiduciary liable under § 405(a)(1), a plaintiff must show (1) that a co-fiduciary breached a duty to the plan, (2) that the fiduciary knowingly participated in the breach or undertook to conceal it, and (3) damages resulting from the breach. *See Diduck v. Kaszycki & Sons Contractors,* 974 F.2d 270, 281–82 (2d Cir.1992) (listing elements of analogous cause of action for non-fiduciary's knowing participation in breach of fiduciary duty). In this case, plaintiff does not argue that Principal participated in Zucker and Fertig's theft. Rather, he argues that Principal knowingly attempted to conceal the theft after it had already occurred.

The court finds this argument unpersuasive. At most, the record indicates that Principal failed to act with diligence based on the knowledge that it had. A failure to act with reasonable diligence is not tantamount to concealment, and plaintiff has not identified any evidence that suggests that Principal actively attempted to conceal what it knew

about the trustees' conduct. To support his claim of concealment, plaintiff points first to a memorandum, written by Bolin, describing his conversation with Freilich. Although the conversation described in that memorandum appears to involve a request by Freilich that Bolin conceal information from the Department of Labor, Bolin's memorandum and his affidavit both emphatically deny that he ever agreed to this request. Nor has plaintiff pointed to anything in the record that contradicts Bolin's assertion. Plaintiff's assertion that Principal was "less than candid," Pl. Mem. at 14, in its reply to the Department's inquiry is wholly unsupported by the record. Principal responded to the letter dated March 30, 1992, on April 2, 1992, and supplied all of the information that the Department requested, including the two letters that it had sent to the trustees.

Plaintiff also asserts that Principal attempted to mislead the participants in the Plan, or, alternatively, that it failed to disclose material information to them. That argument is based entirely on two internal memoranda describing Gowdey's conversation with Lance Burt, a participant in the Plan. The first of these memoranda, written by Gowdey and dated January 14, 1992, reads as follows:

I received a call from Lance Burt who is an employee at Unitron Graphics. He said that Howard Lowett [at Unitron Graphics] gave him my name to call and find out about his account. He said that he knows that his money had transferred to us from Mutual Benefit and he was wondering what he had in his account. I told him that I didn't have enough information to allocate the money received to the individuals' accounts, but that he can be assured that his money is earning interest daily. He argued with me that we've had the money since September and I should be able to tell him something. I took his name and number ... and told him that I had to check with a couple of people and someone would call him back.

(This is the case that the employer has been holding the monies and not submitting them. Our legal department is involved.)

I called John Lee in underwriting. Told him that someone needs to tell Howard Lowett not to have the employees call me and also that someone needs to call Lance Burt back since I have no information to give him. John said he would talk to Linnette Martin in the Group office. One of them would call Howard Lowett and tell him not to give my name and number out and they would also tell him to contact Lance Burt.

Pl.Ex. 11. The second memorandum, also dated January 14, 1992 is from John Lee. It states, in relevant part:

I called Lynn Martin to explain to her that a participant from Unitron called home office to get information on his account, balance, etc. Marla told him that we do not have complete information from the employer for allocations, so we were not able to tell him anything. His name is Lance Burt. . . .

I explained to Lynn that we did not want any call from participants calling the home office for info, plus we felt it was not for us to tell them what the status is on the case. They need to speak with the employer about that.

Lynn said that Joanne Kader, broker, should have mentioned that to the employer. She will call Joanne and remind her to tell the employer not to refer any calls to the home office. They need to speak with Howard Lowitt [sic] or one of the trustees. I also told Lynn that we will not be returning a call to Lance.

Pl.Ex. 10.

Neither of these documents fairly supports a conclusion that Principal was attempting to mislead Burt or any other participant in the Plan. Gowdey's memorandum indicates that Burt called her to find out the balance in his account. At the time of Burt's inquiry, all of the Plan's assets held by Principal were in a single money market account, because Principal had not received any information from Unitron Graphics allocating the $109,811.28 transfer among the various participants. Gowdey was therefore unable to tell Burt how much money was in his account. Gowdey's memorandum indicates that she communicated this information to Burt. Lee's memorandum essentially confirms these details. Neither document can fairly support a conclusion that Gowdey or Lee was attempting to conceal from Burt the fact that the trustees had not yet accounted for all of the Plan's funds. Plaintiff has therefore failed to demonstrate the existence of a genuine issue of material fact that would preclude summary judgment for Principal as to liability under § 405(a)(1).

### B. Liability under § 405(a)(2)

 To hold a fiduciary liable under § 405(a)(2), a plaintiff must demonstrate that the fiduciary failed to comply with its duties under ERISA, and thereby enabled a cofiduciary to commit a breach. For example, as the legislative history to ERISA indicates, a trustee may be liable to a co-trustee in the following circumstances:

A and B are co-trustees and are to jointly manage the plan's assets. A improperly allows B to have the sole custody of the plan assets and makes no inquiry as to his conduct. B is thereby enabled to sell the property and to embezzle the proceeds. A is to be liable for a breach of fiduciary responsibility.

H.R.Conf.Rep. No. 93–1280, 93d Cong., 2d Sess. 43 (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5080; see also Restatement (Second) of Trusts § 224 illus. d (1959) (citing same example). In this case, the court concludes that plaintiff cannot recover under § 405(a)(2) because Principal's conduct did not enable the trustees to commit a breach. Plaintiff acknowledges that Zucker and Fertig stole the money at issue in this action by drawing checks on a Citibank account over which Principal had no control. By the time Principal acquired any control over the Plan's assets, the money had already been stolen. Plaintiff has not identified any action that Principal could have taken which would have prevented the theft.

Presumably, the real thrust of plaintiff's argument under § 405(a)(2) is that, by failing to take appropriate action when it realized that funds were missing from the Plan, Principal prevented other parties from taking action that might have recovered the funds.

Thus argument, however, is relevant to plaintiff's § 405(a)(3) claim, discussed in the next section, rather than § 405(a)(2). For the reasons set forth above, Principal is entitled to summary judgment on plaintiff's claims under § 405(a)(2).

### C. Liability under § 405(a)(3)

■ Plaintiff's strongest argument for holding Principal liable rests on § 405(a)(3). To hold a fiduciary liable under that section, a plaintiff must demonstrate (1) that the fiduciary had knowledge of the co-fiduciary's breach, and (2) that the fiduciary failed to make reasonable efforts under the circumstances to remedy the breach. The court concludes, however, that in order to prevail on a motion for summary judgment, a plaintiff must also be able to identify a reasonable alternative course of action that the fiduciary might have taken that would have prevented a loss to the plan. Because it does not appear that the plaintiff in this case can meet that standard, Principal is entitled to summary judgment on the § 405(a)(3) claim.

The evidence that plaintiff has submitted establishes that, at the latest, Principal became aware that it had not received all of the funds that it expected to receive from Mutual Benefit by November 5, 1991, the date of the first letter to Zucker and Fertig. That letter requested an "immediate" response in the event that the trustees did not intend to forward the funds. The trustees' failure to respond to the November 5 letter can arguably be viewed as a "red flag" that should have alerted Principal to the possibility that the trustees might be using the Plan's money for an improper purpose. See Diduck, 974 F.2d at 283; Whitney v. Citibank, N.A., 782 F.2d 1106, 1116 (2d Cir.1986). A second red flag was raised when the trustees failed to respond to the second letter on January 28, 1992. At that point, while Principal may not have had any actual evidence of misconduct by the trustees, it had reason to be deeply suspicious.

■ Principal argues that plaintiff has not produced any evidence demonstrating that it had actual knowledge of any misconduct. In a related context, however, the Second Circuit has held that constructive knowledge of

a breach can be sufficient for liability to attach. In Diduck, the court held that a non-fiduciary may be liable for knowing participation in a fiduciary's breach of duty. In that context, the court held that the relevant "knowledge" was "knowledge as to the primary violator's status as a fiduciary and knowledge that the primary's conduct contravenes a fiduciary duty." 974 F.2d at 282–83. With respect to the second prong, it held that "[a] defendant who is on notice that conduct violates a fiduciary duty is chargeable with constructive knowledge of the breach if a reasonably diligent investigation would have revealed the breach." Id. at 283. But see also Lee v. Burkhart, 991 F.2d 1004, 1011 (2d Cir.1993) (referring to "actual knowledge" as component of possible claim under § 405(a)(3)). The court therefore will assume, for the purposes of this opinion, that the evidence in the record creates a genuine issue of fact as to whether Principal had sufficient knowledge of the breach to trigger its duty under § 405(a)(3) to make reasonable efforts to remedy the breach.

The evidence that plaintiff has submitted also raises genuine issues of fact as to whether Principal's conduct was reasonable under the circumstances, given what it knew about the missing funds. Assuming that Principal was justified in waiting until November 5, 1991, to contact the trustees about the missing funds, the record contains no explanation of Principal's subsequent inaction. In spite of the letter's stern warning that the missing funds "must be accounted for" and its request that the trustees immediately notify Principal if they did not intend to forward the funds, Principal took no action until January 28, 1992—a full twelve weeks later. Having sent an even more emphatic warning in its follow-up letter, Principal then did nothing for another eight weeks, until the Department of Labor initiated its investigation. Although plaintiff overstates his case when he claims Principal did nothing, this response can hardly be characterized as swift. Given the warning signs it had received, Principal would have been wise to act at a less glacial pace.

■ The court concludes, however, that to prevail in this action, plaintiff must do more

than show that Principal failed to make reasonable efforts to remedy the trustees breach. He must also show that, if Principal had made such efforts, the loss to the Plan, or at least some portion of it, could have been prevented. To be sure, § 405(a)(3) does not, on its face, contain any such requirement of causation. As written, the statute appears to impose liability on a fiduciary *whenever* it has knowledge of a breach, and fails to make reasonable efforts under the circumstances to remedy the breach.

Nor are the authorities that Principal cites in support of its claim that § 405(a)(3) contains a causation requirement highly persuasive. Neither the district court opinion nor the Seventh Circuit's opinion in *Brandt* addressed § 405(a)(3) at all. Those opinions merely held that the language of § 405(a)(2) implies a causal link between a fiduciary's misconduct and loss to a plan. *Omni Funding Group* concluded that § 405(a)(3) requires a causal link, but did not identify a clear textual basis for that conclusion, concluding simply that it was necessary to prevent "manifest unfairness." 731 F.Supp. at 176. In *Brink v. DaLesio,* 496 F.Supp. 1350 (D.C.Md.1980), *aff'd in part and rev'd on other grounds,* 667 F.2d 420 (4th Cir.1981), the court held that § 405(a) requires a causal link. The opinion, however, simply restates the language of § 405(a) and cites to its legislative history, without specifically discussing § 405(a)(3).[5]

▪ Nonetheless, the court is persuaded that plaintiff cannot prevail in this action without showing that, but for Principal's actions, all or part of the loss to the Plan could have been prevented. As discussed above, the jurisdictional vehicle for this lawsuit is § 502(a)(2) of ERISA, which allows fiduciaries to sue for appropriate relief under § 409. It is beyond dispute that § 409 requires a showing of causation. *See Diduck,* 974 F.2d at 270; *Brandt,* 687 F.2d at 898. The plain language of that statute makes a fiduciary liable for "losses to the plan *resulting* from

... [a] breach." 29 U.S.C. § 1109 (emphasis added). In this respect, as in many others, ERISA is similar to the common law of trusts, under which a trustee is liable for a breach of trust only to the extent that the breach causes loss. *See Restatement (Second) of Trusts* § 205 (1959). Since this action must arise under § 502(a)(2), for reasons discussed above, plaintiff is bound by the requirements of § 409 as well as § 405. Plaintiff therefore can recover against Principal only to the extent that its actions actually caused a loss to the Plan.

▪ Plaintiff also suggests that, once he has shown a breach, the burden of persuasion should shift to Principal to demonstrate a lack of causation. That argument stems from a misreading of *Martin v. Feilen,* 965 F.2d 660, 671 (8th Cir.1992), *cert. denied,* 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993). The issue in *Martin* involved the calculation of damages after a plaintiff has proved a prima facia case of loss to the plan or resulting from a breach of duty. Once a prima facie case of causation has been proved, the burden shifts to the defendant to demonstrate that any loss to the plan, or profit to the fiduciary, did not result from the breach. *See Donovan v. Bierwirth,* 754 F.2d 1049, 1056 (2d Cir.1985). The initial burden of proving causation, however, rests with the plaintiff.

▪ To prevail, then, plaintiff must demonstrate not only that Principal failed to take reasonable steps to remedy the breach. He must be able to show that, if Principal had taken reasonable steps, at least some portion of the loss to the Plan could have been prevented. If reasonable efforts could not have remedied the breach, Principal cannot be held liable. Moreover, in order to survive a motion for summary judgment, plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts," *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir.1994) (citations and

---

5. Many of the cases on which Principal relies do not involve co-fiduciary liability under § 405(a) at all. They simply hold that a fiduciary may not be liable as a primary violator unless his actions cause a loss. *E.g. Whitfield v. Lindemann,* 853 F.2d 1298, 1304 (5th Cir.1988), *cert. denied,* 490

U.S. 1089, 109 S.Ct. 2428, 104 L.Ed.2d 986 (1989); *Hecht v. Colorboard Packaging Corp.,* 856 F.Supp. 184, 190 (S.D.N.Y.1994); *Kuper v. Quantum Chemicals Corp.,* 852 F.Supp. 1389, 1396 (S.D.Ohio 1994), *aff'd,* 66 F.3d 1447 (6th Cir. 1995).

internal quotations omitted), *cert. denied*, ⸺ U.S. ⸺, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). He must "produce 'significant probative evidence tending to support [his position].'" *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983) (quoting *United States v. Pent–R–Books, Inc.*, 538 F.2d 519, 529 (2d Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977)). At the very least, then, plaintiff must demonstrate that some reasonable alternative course of conduct would have prevented the loss.

 Plaintiff has not met this burden. Although he repeatedly claims that Principal took no action at all to recover the missing funds, nowhere does he state what Principal might have done, or explain how such action could have led to the recovery of the money. As the legislative history to ERISA notes, the question of what efforts a fiduciary must take to remedy a co-fiduciary's breach is highly fact-specific, depending on "the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach." H.R.Conf.Rep. 93–406, 1974 U.S.C.C.A.N. at 5080. Depending on the circumstances, the appropriate remedy may be "to notify the plan sponsor of the breach or to proceed to an appropriate Federal court for instructions, or to bring the matter to the attention of the Secretary of Labor." *Id; see also Morrissey v. Curran*, 567 F.2d 546, 550 (2d Cir.1977) (Lumbard, J. concurring) (quoting above language from House conference report). To demonstrate that any of these actions could have resulted in a recovery to the Plan, plaintiff would have to produce some evidence concerning what the trustees did with the money and what their financial condition was during the relevant time period.

Plaintiff has not produced sufficient evidence concerning these matters to raise a genuine issue of material fact. Indeed, he acknowledged in response to interrogatories posed by Principal that he had not investigated what the trustees did with the money because he considered it irrelevant to this action. Wolfson Aff., Ex. F. The only evidence that plaintiff has submitted concerning the financial condition of the trustees and of Unitron Graphics consists of a portion of a bankruptcy petition filed by Unitron Graphics pursuant to Chapter 11 of the Bankruptcy Code and a confidential internal memorandum, written on Unitron Graphics stationary, describing a tentative plan of reorganization. The petition appears to have been filed on January 6, 1992, and the memorandum is dated September 7, 1992. These documents do indicate that Unitron Graphics had assets in excess of its liabilities to secured creditors. In response, however, Principal has submitted copies of two orders of the Bankruptcy Court. Those orders indicate that Unitron Graphics never submitted a reorganization plan and that the case was converted into a proceeding under Chapter 7 of the Bankruptcy Code. Furthermore, Principal has submitted a copy of the bankruptcy trustee's report, dated July 23, 1993, stating that he had not "received any property nor paid any money on account of this estate except exempt property" and that, after conducting a diligent inquiry into the debtor's affairs, he had determined that "there is no property available for distribution from the estate over and above that exempted by law...." Wolfson Rep.Aff.Ex. C. Thus it appears that Unitron Graphics did not have sufficient assets to pay any of its unsecured creditors. In light of this subsequent determination, plaintiff's submissions do not raise any genuine issue of material fact as to whether Principal could have recovered the missing funds from Unitron Graphics.[6]

Plaintiff also argues that the fact that Zucker and Fertig have been able to make

---

**6.** Plaintiff also claims that the bankruptcy petition indicates that Zucker and Fertig were continuing to receive a combined $6,700 per week during the period that Unitron Graphics was in the Chapter 11 proceeding. That statement is somewhat misleading. In an affidavit filed pursuant to Local Bankruptcy Rule 11, Fertig stated that that amount was "now being paid and proposed to be paid ... for a period of thirty days following the filing of the Chapter 11 petition." Plaintiff has submitted no evidence that this money was actually paid subsequent to the filing of the petition. Furthermore, without some additional evidence as to the trustees' overall financial condition, the fact that they drew a salary in the period prior to filing the petition does not indicate that they would have been able to restore any of the money they had stolen.

partial restitution to the Plan in the wake of their criminal prosecution suggests that Principal could have recovered even more money from them if it had acted sooner. This conclusion is unsupported by the record. Plaintiff has submitted no evidence as to the financial condition of the trustees in the relevant period, and documents submitted by Principal indicate that the restitution payments Zucker and Fertig did make came from money that they borrowed, rather than from their personal assets.

Without some indication from plaintiff as to what Principal might have done to remedy the trustees' breach, given the specific knowledge that it possessed, and some explanation of how such action would have benefitted the Plan, the court cannot conclude that Principal's conduct caused a loss. Since proof of causation is an essential element of plaintiff's action, Principal is entitled to summary judgment.

### CONCLUSION

For the foregoing reasons, Principal's motion for summary judgment is granted, and plaintiff's motion is denied. Furthermore, since plaintiff does not seek any relief against Zucker and Fertig, the sole remaining defendants, this action is dismissed without prejudice against them. In addition, all cross-claims and counter-claims are dismissed as moot. The Clerk of the Court is instructed to enter judgment accordingly.